UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    -against-                                         11 Civ. 493 (CM)

CHRISTOPHER METCALF et al.,

                Defendants.

------------------------------------------------------------x

**DECISION AND ORDER GRANTING PLAINTIFF'S MOTION
FOR ENTRY OF FINAL JUDGMENT AGAINST
DEFENDANT CHRISTOPHER METCALF**

McMahon, J.:

This civil enforcement action was commenced by the Securities and Exchange Commission ("SEC") against defendant Christopher Metcalf ("Metcalf") and another individual, Bodizar (Bob) Vukovich ("Vukovich"), and their company, Pantera Petroleum ("Pantera"), now known as ESP Resources, Inc. The individual defendants stand accused of having engaged in a fraudulent scheme to manipulate the market for Pantera stock by paying bribes to cause purchases of that stock – bribes that turned out to be paid to an undercover agent as part of a "sting" operation. Metcalf elected not to fight the charges against him – ostensibly, he says, because he lacked the resources to do so – and instead consented to the entry of partial judgment against him. The consent injunction bars him from violating the federal securities laws in the future. The parties agreed that the SEC's request for additional relief – a penny stock bar, and officer and director bar, and a civil penalty – would be decided on motion. The Commission has now made its motion, and although Metcalf has admitted all the allegations of the complaint as

1

part of the consent injunction, he opposes the entry of a further judgment containing any of the relief requested by the SEC.

For the reasons stated below, the SEC's motion is GRANTED to the extent of imposing a five year penny stock and officer and director ban on plaintiff, as well as a civil penalty in the amount of $50,000.

## I.     Statement of Admitted Facts

Since Metcalf has admitted the allegations of the complaint, he cannot now contest them. They do not paint a particularly pretty picture.

Pantera was at all relevant times a Nevada corporation purporting to be an oil and gas exploration company. Its stock was registered with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act"), and was quoted on the Over the Counter Bulletin Board. It qualified as a "penny stock" as it did not meet any of the exceptions from the definition of penny stock contained in Rule 3a51-1 of the Exchange Act, 17 C.F.R. § 240.3a51-1.

From September 12, 2007 until December 29, 2008, Metcalf was Pantera's President and Chief Executive Officer. Vukovich is a stock promoter; he lives in Canada.

On March 3, 2008, Metcalf was introduced to an undercover FBI Agent, posing as an individual named Moore. Moore held himself out as someone who could arrange for the purchase of up to $2 million in Pantera stock by a group of registered representatives who held discretion over the accounts of wealthy investors. "Moore" explained that his brokers would buy the Pantera stock through matched trades in exchange for a 30% kickback. "Moore" explained that his brokers would not disclose the kickbacks to their customers.

Metcalf agreed to pay the kickback in exchange for the purchase of up to $2 million in Pantera stock. He also agreed to keep the payment of kickbacks a secret from Pantera's investors. "For obvious reasons," Metcalf said, he could not execute the trades himself, so he asked "Moore" to coordinate the trades with Vukovich, whom Metcalf described as his "partner."

On March 11, 2008, Vukovich spoke to "Moore" by telephone and confirmed the entire arrangement as discussed previously between Moore and Metcalf. Vukovich agreed to perform a "test" transaction, during which "Moore's" brokers would purchase 200,000 shares of Pantera stock; if the test worked (and if Vukovich paid the agreed-upon kickback to "Moore"), "Moore" would then purchase the $2 million in stock that the defendants wished to sell. Vukovich, like Metcalf before him, agreed to keep the payment of the kickbacks a secret.

Between March 25 and March 31, 2008, Vukovich instructed "Moore" to submit orders to buy a total of 215,000 shares of Pantera stock for an aggregate purchase price of $125,250. To effect the necessary matching of "Moore's" buy orders with Vukovich's sell orders, Vukovich gave "Moore" precise instructions concerning the size, price and timing of the buy orders, as well as which market makers to contact in order to obtain execution. By following these instructions, "Moore's" purchase orders were matched against Vukovich's sell orders at prices that Vukovich had prearranged. Vukovich paid the agent his 30% kickback in two installments, on April 1 and 15, 2008.

On August 11, 2008, during a telephone call with "Moore," Metcalf asked "Moore" to purchase another $350,000 of Pantera stock through Vukovich in exchange for the same 30% kickback. This conversation was recorded. The court has been given the audio file (Sukhatme Ex. 4) and a transcript of the conversation (Sukhatme Ex. 5). After listening to the recording, it

3

appears to this court that the transcript is essentially accurate, especially in capturing Metcalf's enthusiastic participation in a second round of matched purchases and sales. Although "Moore" initiates the conversation, Metcalf makes it clear that he and Vukovich had been talking about getting in touch with him to "do some more deals." (Tr. 3).[1] Metcalf told "Moore" that the company would have some good news coming out soon in terms of flow rates at a particular well; that he needed money for other projects, including one on which he was putting down money the next day, that he was waiting for the money "to come in," and that "part of the reason (indiscernible) Bob and you is to try and get that money through, you know, the things that you guys do." (Tr. 5). The "things that you guys do," of course, is matched purchases and sales of stock. Metcalf, not Moore, opened the discussion of this issue before attempting to distance himself from carrying out of the project, which he was plainly content to leave to Vukovich. He did, however, confirm that he (Metcalf) was "thinking" that "Moore" would buy "probably quarter million dollars, something like that," of Pantera stock. During the conversation, Metcalf again agreed not to disclose the kickback payment to Pantera's investors.

Eleven days later, on August 22, 2008, "Moore" purchased 90,000 shares of Pantera stock for an aggregate purchase price of $25,200. Vukovich gave the agent precise instructions concerning the size, price and timing of the buy orders, so they would match his sell orders at the appropriate prearranged prices.

After the customary years of investigation, the Commission brought this action in 2011, naming Metcalf, Vukovich and Pantera (now known as ESP Resources, Inc.) and charging a scheme to manipulate the market for Pantera stock through broker bribery. Metcalf entered into

---

[1] I listened carefully to the tape, because Metcalf insists that the word used was not "deals," but it sure sounded like "deals" to me, and from the context it is quite clear that Metcalf was talking about matched purchases – whether he referred to them as "deals" or as something else.

a consent injunction with the Commission and the court entered partial judgment against him on July 12, 2011. One term of that injunction left it to the court whether to impose additional penalties on Metcalf and gave him permission to oppose the imposition of any further relief. However, Metcalf stipulated that he would admit that the allegations of the complaint were true for purposes of this application.

## II. Industry Bar Orders Against Metcalf

The federal securities laws provide that the Court may order a penny stock bar "against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock." 15 U.S.C. §§ 77t(g), 78u(d)(6)(A). At all times relevant to this action, Pantera was a "penny stock" within the meaning of the Exchange Act since it did not sell at or above five dollars per share and had average revenue of less than $6 million and net tangible assets of under $2 million. 15 U.S.C. § 78c(51)(A); 17 C.F.R. § 240.3a51-1. (Sukhatme Decl., Ex. 1 ¶ 15).

In addition to seeking a penny stock bar, the SEC asks that the Court bar Metcalf from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act. These provisions provide that the Court may prohibit any person who violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") or Section 10(b) of the Exchange Act from acting as an officer or director if "the person's conduct demonstrates substantial unfitness to serve as an officer or director of any such issuer." 15 U.S.C. §§ 77t(e), 78u(d)(2). The Senate Committee Report accompanying these provisions noted that courts have had and continue to have inherent power to bar persons from serving as officers and directors, and went on to explain that the new statutory bar provisions "are intended to protect public investors from persons who, by engaging in fraudulent conduct, already have

5

demonstrated that they should not be entrusted with authority over investor funds." S. Rep. No. 337, 101st Cong., 2d Sess. 22 (1990). The Report also expressed the view that a statutory bar would be especially appropriate where, as here, a defendant commits fraud as a result of his position within the company: "Although the express authority to grant this relief [officer and director bar] is not limited to corporate officers or directors, the Committee believes the remedy of a bar or suspension from service as a corporate officer or director is especially appropriate in cases in which a defendant has engaged in fraudulent conduct while serving in a corporate or other fiduciary capacity." *Id.* at 22.

When determining whether either a penny stock or officer and director bar is warranted, courts analyze the same factors. *See SEC v. Universal Express, Inc.*, 475 F.Supp.2d 412, 429-30 (S.D.N.Y. 2007) (citing *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979)). These factors, as outlined by the Second Circuit in *SEC v. Patel*, 61 F. 3d 137, 141 (2d Cir. 1995) include: (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur. *Id.*

Taken as a whole, the *Steadman/Patel* factors favor the issuance of industry bars against Metcalf.

The first factor is the egregiousness of the underlying offense. The admitted facts reveal that Metcalf knowingly and enthusiastically engaged in a broker bribery/stock manipulation scheme involving Pantera's stock while serving as Pantera's President and CEO. Metcalf argues that the SEC has not demonstrated that the matched trades in this case resulted in a substantial loss or a risk of substantial loss to others; he argues further that they were not intended to do so.

6

But matched trades, like the trades described in the Complaint, are pernicious precisely because by creating the appearance of additional market activity, they create a substantial risk of loss to investors. *See Graham v. SEC*, 222 F.3d 994, 999 (D.C. Cir. 2000) (affirming SEC decision that matched trades create a deceptive appearance of volume); *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 595 (10th Cir. 1979) (affirming SEC decision that matched trades are manipulative because they show the appearance of market volume). In *In the Matter of the Application of Howard R. Perels*, Admin. Proc. File No. 3-10288, 2002 SEC LEXIS 847 (April 4, 2002), the Commission confirmed an ALJ decision finding that the defendants' prearranged trades were manipulative because they interfered with the free forces of supply and demand. In so holding, the Commission described how matched trades manipulate the market and create substantial risk of loss to investors who are determining whether to purchase stock:

> Although the mechanisms for manipulation can be myriad, a recognized vehicle for manipulative activity is prearranged, matched trades. The purpose of this illicit practice is to give investors and market participants the false impression that there is interest in the stock. As we have stated previously: "when investors and prospective investors see activity, they are entitled to assume that it is real activity . . . determined by the unimpeded interaction of real supply and real demand . . . . Manipulations frustrate [this] expectation . . . . The vice is that the market has been distorted and made into a "stage-managed performance."

2002 SEC LEXIS 847, 15-16 (SEC 2002).

Furthermore, the scheme alleged in the Complaint was to place this stock into the accounts of wealthy customers over which the broker had discretion, without informing the customer that the broker had received a kickback. Metcalf admittedly and repeatedly agreed to keep this information from any customers. The scheme was intended to cause harm to customers.

The second factor is whether defendant is a repeat offender. The Commission argues that Metcalf's fraud was not an isolated incident, because he repeatedly urged the Agent to fraudulently purchase Pantera stock over the course of six months. Technically, the Commission is correct: Metcalf's August foray into matched trading was his second such venture in a six month period. This court knows of no requirement that someone have been found guilty of a securities violation in the past in order to qualify as a repeat offender, and the cases cited in the Commission's reply brief (at page 6) suggest otherwise. However, the incidents in the record were part and parcel of a single scheme, and there is no evidence in the record of any other scheme in which Metcalf participated. So while someone in Metcalf's situation could be called a repeat offender, this factor does not weigh strongly in favor of the imposition of draconian penalties.

However, the third *Steadman/Patel* factor – defendant's role or position when he engaged in the fraud – strongly supports the Commission's request for relief. Contrary to Metcalf's insistence that he was not personally involved in the stock manipulation, and that the carrying out of the matched sales was done entirely by Vukovich, the record reveals that Metcalf was entirely open to creating a false market in Pantera stock in order to fool the market into thinking that the company was a sound investment. Metcalf's effort to place on the admitted facts a gloss that they will not bear – one that minimizes his own culpability and casts the entire blame on his partner, Vukovich – is both unconvincing and, in the opinion of this court, contrary to his stipulation to the truth of those facts.

Metcalf may have been trying to raise money to fund his operations, and he may well have believed that his operations would prove successful, so no real investors were harmed. But Metcalf's motive does not excuse his method of doing business. Defendant specifically told

"Moore" that he hoped to get money to finance transactions via "the things that you guys do" – matched sales – rather than from legitimate activity. The notion, advanced by Metcalf in opposition to the SEC's motion, that he was trying to interest "Moore" in arranging private placement transactions with investors to finance them is, in my opinion, entirely untenable.

Metcalf was fully conversant with the details of the illegal activity and with the need for secrecy. Having engaged in one such transaction in the spring of 2008, Metcalf himself went back to "Moore's" well in August by asking the Agent if the Agent "wanted to do some more deals" because Pantera will have "some good news coming out" and needed more money to finance its transactions. (Sukhatme Decl., Ex. 5 at 3). The Agent clearly explained to Metcalf that the brokers would purchase the shares in discretionary accounts "like the ones we did in March" (when he knew perfectly well that a 30% kickback was paid to the Agent); he also insisted that Metcalf could not tell the customers about the kickback payment. (*Id.* at 9). Metcalf's opposition brief, which argues that he never paid or agreed to pay "Moore" a kickback in connection with the August transaction (Br. at 6), comes perilously close to violating the terms of the Consent Judgment into which Metcalf willingly entered. The fair import of that judgment, in which all the allegations of the complaint are admitted, is that Metcalf well understood that he was engaged in fraudulent activity and that it was intended to deceive Pantera shareholders.

What Metcalf did do was to leave "all that kind of stuff" up to "you and Bob." Whether Metcalf knew all the details about the matched sales, or helped to set (or was even aware of) the price at which they took place, is ultimately irrelevant. The evidence plainly shows that "Moore" worked the trades with Vukovich because Metcalf specifically directed him to do so. The fact that Metcalf orchestrated the scheme through someone else, in order to lend himself plausible deniability, does not cut in his favor. And in any event, because Metcalf has admitted

9

that Vukovich was his partner, Metcalf is fully responsible for Vukovich's matched trading, which manipulated the public market for Pantera stock.

The fourth factor is scienter, and the evidence demonstrates that Metcalf acted with a high degree of scienter. Metcalf did not sell any shares in Pantera into this scheme; he couldn't, because his stock was restricted. However, he had a substantial economic stake in the transaction. Metcalf was the single largest shareholder of Pantera. Pantera was a failing company, and the value of Metcalf's stock was declining precipitously during the period from May to September 2008. Given its precarious financial situation, the only way for Metcalf to protect his equity was to raise significant amounts of capital. Metcalf told the Agent that the money from the fraudulent stock sales would be invested in Pantera. When the Agent asked Metcalf how the money flows to Pantera, Metcalf responded: "I wouldn't worry yourself about that … it happens." (Sukhatme Decl., Ex. 5 at 14). As the majority shareholder of Pantera at the time of the fraud, Metcalf stood to profit directly from any benefit to the company. (*Id.* Ex. 6 at 52). And Metcalf hoped that the benefit would be substantial; he told "Moore" that he ultimately wanted the Agent to purchase two million dollars of Pantera stock. (Sukhatme Decl., Ex. 1 ¶17). Contrary to Metcalf's argument, his role in the offense was not "minor" compared to that of Vukovich, and it is offensive for him to so assert.

Finally, as President and CEO of Pantera, Metcalf offered to use his position of corporate trust to commit fraud. Metcalf offered to hire the Agent as a consultant to cover up the violative conduct, further proving that Metcalf knew his misconduct was illegal. Metcalf told the Agent: "I could hire you as a consultant and we could just say whatever you do, you're just a financial consultant . . . we can issue you restricted stock in that regard." (Sukhatme Decl., Ex. 5 at 11-

10

12). Metcalf withdrew the consulting offer only after learning that several stock promoters had been arrested as a result of similar schemes. This evidence is also highly indicative of scienter.

The last *Steadman/Patel* factor is likelihood of recidivism. One can never be certain whether a defendant will recidivate. However, this particular defendant's steadfast refusal to acknowledge, except in the most technical sense, that he did anything wrong, or participated in misconduct, does not augur well in my mind. Metcalf's statement that he settled with the SEC only to avoid the cost of litigation, his twisting of the plain meaning of the allegations of the complaint, and his effort to place the entire blame for this sorry episode on his confederate Vukovich, are deeply troubling to the court. So is his apparent belief that his motive (to raise money for Pantera's operations) somehow renders his conduct more palatable. The fact that the defendant is an attorney at law makes his disregard for the law in this case deeply troubling.

Of course, the fact that the defendant is subject to an injunction against further violations of the securities laws is a persuasive factor in the opposite direction. So is the fact that this is his first reported violation of law.

On balance, I conclude that some sort of penny stock and officer-director bar should issue. But I do not think it need be for the duration of Metcalf's life.

The Commission has acknowledged, in its Reply Brief, that the Court would be acting within its power to conclude that a lifetime ban was excessive but that a bar for a shorter period was in order. (SEC Reply Br. at n. 1). For the reasons set forth above, I conclude that the defendant should be subject to a penny stock bar and an officer and director bar for a period of five years.

## III. Civil Monetary Penalties Against Metcalf

The Securities Act and the Exchange Act authorize the Court to impose civil money penalties for violations of the securities laws. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). Through the civil penalty provisions, Congress sought to deter future violations of the securities laws. "[T]he deterrence of securities fraud serves . . . important nonpunitive goals, such as encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry." *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998), *cert denied*, 525 U.S. 1023 (1998). "Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d), provide for the imposition of civil penalties, for any violation of the Act involving 'fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement' that 'resulted in . . . or created a significant risk of substantial losses.'" *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

Under these penalty provisions, the Court determines the amount of the civil penalty in light of the facts and circumstances of the particular case. Penalties are described in three tiers, imposing escalating fines according to the severity of the violations. Where, as here, the violations involve fraud, deceit and manipulation and directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons, third-tier penalties against an individual of up to the greater of his gain or $130,000 may be imposed for each violation. 15 U.S.C. §§ 77t(d); 78u(d)(3);[2] *see also* 17 C.F.R. § 201.1003.

---

[2] The statute actually sets the penalties at lower amounts. However, pursuant to the Debt Collection Improvement Act of 1996, these amounts have been adjusted for inflation. Because the relevant conduct occurred in 2008, the maximum penalty is $130,000. 17 CFR § 201.1003.

12

Metcalf's conduct satisfies the requirements for imposing the maximum allowable penalty. Among other things, Metcalf abused his position as President and CEO of a public company to manipulate his company's stock. This market manipulation scheme created significant risk of substantial losses to other persons, particularly those unsophisticated investors who bought shares of Pantera while its market price was manipulated.

As the SEC anticipated, Metcalf argues that he gained nothing from the fraudulent activity and pleads that he could not pay a third tier penalty. However, third tier penalties have been imposed without regard to a defendant's ability to pay and even when the defendant did not gain financially from his illegal activities. *See SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341, *4 (S.D.N.Y. 2002) ("[Defendant]'s claims of poverty cannot defeat the imposition of a disgorgement order or civil penalty."). Furthermore, while I would ordinarily be inclined to take Metcalf's financial situation into account in fashioning the amount of his civil penalty, he has given me no hard evidence of his purported inability to pay third-tier penalties – aside from his word, which (as the Commission notes) is suspect. In a sworn financial statement given by Metcalf to the SEC in 2011, Metcalf claimed assets of $567,223. Today he says he is worth less than $50,000. But he provides nothing to support that contention – no bank or brokerage statements, no hospital bills or evidence of unanticipated expenses – to explain why, in the space of a year, his net worth has declined by 90%. If Metcalf, knowing that he faced the very real possibility of civil financial penalties, chose to spend down his assets, or failed to adjust his lifestyle, that is his problem, not the Commission's or this court's.

Furthermore, Metcalf's recent filing with this court does not even detail his assets and his liabilities; and his filing last year with the Commission revealed that his liabilities consisted

13

principally of loans bearing little or no interest that were extended to him by family and friends – debts that cannot come ahead of civil penalties.

Metcalf is represented by experienced and sophisticated counsel; there is no reason for me to await a further submission on his financial status, because if there were hard evidence to back up his claim of near-poverty (or hard evidence that would likely appeal to a court), I am sure I would have it in hand by now.

Metcalf's attorneys contend that he will have to go to school in order to develop a new skill. Frankly, that does not move me. Metcalf holds both a J.D. from the University of Virginia and an M.B.A. from the University of Chicago. He is admitted to practice law in California, and I know of no effort to disbar him (although I am advised that his current status is "inactive"). He has plenty of training. He can get some sort of job. His further educational expenses must not be allowed to come ahead of civil penalties.

The Tier 3 penalty amount is capped at the greater of the defendant's gain or $130,000. The defendant had no gain, and frankly, that impacts the court's assessment of whether the maximum penalty should be imposed. It should not. The only violations known to the court are those in which the Government's Agent "Moore" participated. While there was risk to the public, there was in the end no harm to the public. A civil penalty of $50,000 is sufficient to fulfill Congress' intent while penalizing the defendant financially for his participation in a market manipulation.

The Commission shall prepare a final form of judgment consistent with this order.

This constitutes the decision and order of the Court.

Dated: November 13, 2012

_____
U.S.D.J.

BY ECF TO ALL COUNSEL